IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HEIDMAR TRADING LLC,       §
      §
      Plaintiff,       §
      §
v.       §   Civil Action No. H-11-3847
      §
EMIRATES TRADING AGENCY, LLC, §
EMIRATES STAR PTE., LTD. and §
STAR MARITIME PTE., LTD.,       §
      §
      Defendants.       §

**MEMORANDUM OPINION**

Pending before the court is Emirates Star's Amended Motion to Vacate (Doc. 24) and the responses filed thereto. Having considered the motion, response, arguments of counsel and evidence, the motion is **GRANTED** for the reasons stated below.

**I.   Procedural Background**

On November 1, 2011, Plaintiff Heidmar Trading, LLC, ("Heidmar") filed a verified complaint against Emirates Trading Agency, LLC, ("ETA"), Emirates Star Pte., Ltd. ("Emirates Star") and Star Maritime Pte, Ltd., ("Star Maritime"). According to the complaint, ETA operates a fleet of ocean-going dry bulk cargo vessels that transports goods through contracts of affreightment or charter parties.[1]  In 2008, Heidmar and ETA entered into a series of contracts for vessel fuel oil for the purpose of hedging market risks of fluctuating fuel costs ("Bunker Swap Contracts").[2]

---

[1]      Doc. 1, V. Original Compl., pp. 2-3.

[2]      <u>Id.</u>

Heidmar alleges that the acquisition and cost containment of bunkers is an essential component of the maritime industry.[3]

The verified complaint alleges that ETA failed to make its payments as agreed in the Bunker Swap Contracts and that as of February 2009, it owed Plaintiff in excess of $24,000,000.[4]  As a result of the arrearage, on February 1, 2009, Heidmar and ETA agreed that ETA would pay a minimum of $500,000 per month on its obligation under the Bunker Swap Contracts.[5]  This agreement was memorialized in the Special Payment Schedule Agreement.[6]

According to the complaint, ETA failed to make its payments for bunkers under either the Bunker Swap Contracts or the Special Payment Schedule Agreement and, as of October 31, 2011, owed Heidmar $7,755,003.88 in principal and accrued interest.[7]

On November 1, 2011, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rules"), Plaintiff filed a Motion for Issuance of Process of Maritime Attachment and Garnishment, seeking the attachment of M/T EMIRATES STAR.[8]

---

[3]     Id.

[4]     Id.

[5]     Id. at p. 5.

[6]     Id.

[7]     Id.

[8]     See Doc. 2, Mot. for Iss. of Process.

2

According to Plaintiff, ETA is the true owner of the M/T EMIRATES STAR, and the vessel's registered owner, Emirates Star is merely an alter ego of ETA.[9]    On November 1, 2011, the court granted Plaintiff's motion and ordered M/T EMIRATES STAR arrested.[10]

On November 4, 2011, Emirates Star moved to vacate the attachment of M/T EMIRATES STAR on the grounds that it is not the alter ego of ETA.    The court held an evidentiary hearing on November 10, 2011, and makes the following findings of fact and conclusions of law.

**II.  Findings of Fact**

1.  ETA is a business entity organized under the laws of the United Arab Emirates, with a principal place of business at Ascon House, P.O. Box 5239, Salahuddin Road, Dubai, U.A.E.  Relevant to the present dispute, ETA owns or manages a fleet of ocean-going dry bulk vessels that operate in international waters.

2. Emirates Star is a business entity organized under the laws of Singapore, with a registered address of 21, Raffles Place, #18-00 Clifford Centre, Singapore (048621) and is the registered owner of the M/T EMIRATES STAR.

3.  Star Maritime is a business entity organized under the laws of Singapore, with a registered address of 21, Raffles Place, #18-00 Clifford Centre, Singapore (048621).  Star Maritime owns

---

[9]    See Doc. 1, V. Original Compl., pp. 5-9.

[10]    See Doc. 5, Order.

Emirates Star.  According to one of its directors, Star Maritime convenes regular director meetings, keeps its accounts and records and conducts its affairs in accordance with the Singapore Companies Act.[11]

4.  Star Maritime was originally owned by ETA Star Holdings, Ltd., Ascon House, P. O. Box 5239, Salahuddin Road, Dubai, U.A.E. In 2009, the ownership of Star Maritime was transferred to Star Maritime Holding Co., Ltd., a British Virgin Islands company.[12] Star Maritime Holding Co., Ltd., is owned by Essa Abdullah Ahmad Al Ghurair, Abdulla Ahmed Al Ghurair, Ibrahim Abdulla Ahmed Al Ghurair, Syed Mohamed Salahuddin and Arif Buhary Rahman.

5.  ETA does not have an ownership interest in either Star Maritime or Emirates Star.[13]  Conversely, neither Star Maritime nor Emirates Star has an ownership interest in ETA.[14]

6.  During 2008, Heidmar and ETA entered into three contracts relating to the price of vessel fuel oil, commonly known as bunkers.[15]  Bunkers are an essential component of maritime commerce. The contracts were designed to hedge the market risks of purchasing bunkers on the spot market by setting a fixed price on fuel during

---

[11]   Doc. 11, Emirates Star's Mot. to Vacate, Decl. of Ahamed Harris, Ex. 1, ¶ 10.

[12]   Id. at ¶ 14.

[13]   Id. at ¶ 20.

[14]   Id. at ¶¶ 22, 23.

[15]   See Doc. 28, Bunker Swap Contracts, Pl.'s Exs. 1-3.

set time periods.   The fixed price and quantity were set with reference to ETA's fleet's fuel needs and used the "Singapore HSFO 380 cst" as the reference price.   For example, if the spot market price was lower than the fixed price, ETA would owe Heidmar the price difference, based on the quantity of fuel purchased.   If the reference price was higher than the fixed price, Heidmar owed ETA the difference.   The amounts owing were settled at the end of every month.

7.   The Bunker Swap Contracts were signed by Gary W. Lawson on behalf of Heidmar and by Mohamed Azhar (a/k/a/ Mohamed Azhar Idris) on behalf of ETA.[16]   Mohamed Azhar, an executive of ETA, is also a director of Emirates Star and Star Maritime.[17]

8.   The Bunker Swap Contracts provide that New York law governs.[18]   Each contract also states, "Each party expressly submits to the exclusive jurisdiction of the Federal and State Courts located in the State of New York and waives any right it may have to a trial by jury in respect to any proceeding relating to this Confirmation or the Transaction."[19]

9.   ETA failed to make its monthly payments to Heidmar under

---

[16]    Id.

[17]    Id. (Azhar signing as "Management Executive"); see also Star Maritime's 2009 Annual Report, Pl.'s Ex. 4, p. 1 (Azhar listed as one of two directors); Emirates Star's 2009 Annual Return, Pl.'s Ex. 6, p. 3(Azhar listed as a director).

[18]    Id. at ¶ 8 "Governing Law," p. 6.

[19]    Id.

the Bunker Swap Contracts, and as of February 20, 2009, owed Heidmar $24,224,659.

10.   On February 1, 2009, Heidmar and ETA entered into a Special Payment Schedule Agreement whereby ETA promised to pay Heidmar a minimum of $500,000 per month until its obligations under the Bunker Swap Contracts were satisfied.[20]   This contract was executed on behalf of ETA by Noohu Mohamed Ameer Fizel (a/k/a Faisal), an ETA executive.[21]   Fizel is a director of Emirates Star and Star Maritime.[22]

11.   ETA has failed to pay Heidmar under the Bunker Swap Contracts or the Special Payment Schedule Agreement and, as of October 31, 2011, owes Heidmar $7,755,003.88.

12.   ETA entered into a time charter for the M/T EMIRATES STAR in 2007 for a daily charter hire rate of $21,000.[23]   In 2009, the market prices dropped and ETA fell behind on its payments to Emirates Star.[24]   On January 10, 2010, ETA and Emirates Star agreed that Aquabella Shipping would be substituted for ETA on the time charter and that the vessel would be sub-chartered to Heidmar's

---

[20]   See Doc. 28, Special Payment Schedule Agreement, Pl.'s Ex. 11.

[21]   Id. at p. 4.

[22]   See Doc. 28, 2009 Annual Return of Emirates Star, Pl.'s Ex. 6, p. 3 (listing Fizel as a director); 2009 Annual Return of Star Maritime, Pl.'s Ex. 7, p. 3 (listing Fizel as director).

[23]   See Doc. 11, Claimant's Mot. to Vacate, Decl. of Ahamed Harris, ¶ 35.

[24]   Id.

6

Dorado Pool.[25]

13.   Aquabella agreed to immediately pay Emirates Star any charter hires received for the M/T EMIRATES STAR.[26]  Emirates Star released ETA from the terms of the time charter and leased the vessel to Aquabella on a less-favorable voyage charter basis.[27]

14.   Ahamed Harris explained that the decisions not to pursue ETA for money owing under their time charter and to lease the M/T EMIRATES STAR on a going-forward basis to Aquabella on a voyage charter basis were based on business expediency and not because either Emirates Star or Star Maritime was an alter ego of ETA.

### III.  Conclusions of Law

The Federal Rules of Civil Procedure ("Rules") incorporate the Supplemental Rules.  See Fed. R. Civ. P. 9(h)(1).  The Supplemental Rules expressly apply to "admiralty and maritime claims within the meaning of Rule 9(h) with respect to . . . maritime attachment and garnishment."  Supplemental R. A(1).

Supplemental Rule B provides for attachment in connection with in personam actions: "If a defendant is not found within the district when a verified complaint praying for attachment and the [supporting] affidavit . . . are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or

---

[25]   Id. at ¶¶ 33, 34.

[26]   Id. at ¶ 35.

[27]   Id. at ¶¶ 35, 36, 40.

intangible personal property . . . ."  Supplemental R. B(1)(a).
When property is attached, "any person claiming an interest in it
shall be entitled to a prompt hearing at which the plaintiff shall
be required to show why the arrest or attachment should not be
vacated or other relief granted consistent with these rules."
Supplemental R. E(4)(f).  Supplemental Rule B provides for a quasi
in rem proceeding.  See Sembawang Shipyard, Ltd. v. Charger, Inc.,
955 F.2d 983, 987 (5th Cir. 1992).  The claim is against the named
person, but, when that person cannot be found in the district, the
plaintiff may proceed against the thing.      Id.; see also
Supplemental R. B(1).

### a.  Admiralty Jurisdiction

Emirates Star argues that the underlying dispute between
Heidmar and ETA is not maritime in nature.  The argument has two
parts: 1) the controlling contract for determining the court's
jurisdiction is the Special Payment Schedule Agreement, which is a
non-maritime settlement agreement; 2) the Bunker Swap Contracts
themselves are not maritime contracts.

The court easily disposes of the first argument.  Heidmar's
Verified Original Complaint clearly alleges that ETA breached its
obligations under the Special Payment Schedule Agreement *and* the
Bunker Swap Contracts.[28]  Moreover, the Special Payment Schedule
Agreement explicitly stated that it was not a settlement of the

---

[28]      See Doc. 1, V. Original Compl., p. 5.

obligations under the Bunker Swap Contracts.[29]   Therefore, the
Special Payment Schedule Agreement is not controlling.   The court
finds that it need not make a determination regarding the Special
Payment Schedule Agreement if it can exercise jurisdiction over
Heidmar's contract claim based on the Bunker Swap Contracts.   That
question warrants a bit more discussion.

To proceed under Supplemental Rule B, the claim must fall
within the court's admiralty jurisdiction.   See Fed. R. Civ. P.
9(h)(1); Supplemental R. A; Alphamate Commodity GMBH v. CHS Eur.
SA, 627 F.3d 183, 186 (5th Cir. 2010).   A breach of contract claim
is an admiralty claim if the contract on which the suit is based is
a maritime contract.   Gulf Coast Shell & Aggregate LP v. Newlin,
623 F.3d 235, 240 (5th Cir. 2010)(finding that an oral agreement to
transfer title of a vessel to a third party was not a maritime
contract).   "A maritime contract is one relating to a ship in its
use as such, or to commerce or navigation on navigable waters, or
to transportation by sea or to maritime employment." Id. (internal
quotations omitted)(emphasis omitted)(quoting J.A.R., Inc. v. M/V
LADY LUCILLE, 963 F.2d 96, 98 (5th Cir. 1992)).   The focus is on the
protection of maritime commerce.   Alphamate Commodity GMBH, 627
F.3d at 186 n.4 (quoting Foremost Ins. Co. v. Richardson, 457 U.S.
668, 674 (1982)); see also Norfolk S. Ry. Co. v. Kirby, 543 U.S.

---

[29]   See Doc. 28, Special Payment Schedule Agreement, Heidmar's Ex. 11,
¶ 6 ("Except as expressly provided herein, Heidmar does not waive any of its
rights or remedies under the [Bunker Swap Contracts] or otherwise connected
therewith.   Any such rights and remedies remain in full force.").

14, 24 (2004)(finding a contract to be maritime because it had as its primary objective "to accomplish the transportation of goods by sea").

In determining whether the underlying dispute arises under the court's admiralty jurisdiction, the court must consider "the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." Norfolk S. Ry. Co., 543 U.S. at 24 (internal quotations omitted)(quoting N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919)); see also Gulf Coast Shell & Aggregate LP, 623 F.3d at 240 (quoting Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 611, 612 (1991), and instructing courts to consider whether the "nature of the transaction was maritime and whether the services performed under the contract [were] maritime in nature"); Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1213-14 (5th Cir. 1986)(stating that a contract is maritime if there is "a direct and proximate juridic[al] link between the contract and the operation of the ship, its navigation or its management afloat").

It is well-established that fuel for vessels is a necessary giving rise to a maritime lien pursuant to 46 U.S.C. § 971. Gulf Oil Trading Co. v. M/V Caribe Mar, 757 F.2d 743, 747 (5th Cir. 1985). It is also well-settled that bunker supply contracts are maritime in nature. See Exxon Corp., 500 U.S. at 612. This is

10

true even when one party to the contract purchases the fuel from a third party and the third party delivers the fuel to the vessel. Id. at 612-13.

The court has no difficulty in concluding that Bunker Swap Contracts are maritime in nature.  According to Heidmar's Verified Complaint, the purpose of the contracts was "to hedge the market risks associated with the need to supply bunkers to its fleet of ocean-going dry bulk cargo vessels."[30]  While Emirates Star argues that the contracts are not maritime contracts because they do not reference any specific vessel, vessel route or maritime commerce, the actual nature of the relationship between the parties directly involves the management of vessels in Heidmar's Dorado pool and the necessary supply of fuel to those vessels time chartered to the Dorado pool.  As such, the court finds that the contracts are directly linked to the operation of vessels in maritime commerce.

### b. Forum Selection Clause

Having found admiralty jurisdiction, the court turns to Emirates Star's argument that it should not exercise jurisdiction because the Bunker Swap Contracts contain exclusive forum selection clauses requiring Heidmar to bring claims related to the contracts in federal or state court in the State of New York.

When a court interprets maritime contracts, it applies general principles of contract law recognized by admiralty law rather than

---

[30]     Doc. 1, V. Original Compl., p. 3.

those adopted by state law.  One Beacon Ins. Co. v. Crowley Marine
Servs., Inc., 648 F.3d 258, 262 (5th Cir. 2011).  Admiralty law
instructs that contracts be interpreted such that all of the terms
in a contract are given meaning and none are rendered superfluous.
Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550, 555 (5th Cir.
2004).

     Forum selection clauses are "prima facie valid."  M/S BREMEN
v. Zapata Off-Shore Co., 407 U.S. 1, 9-10 (1972)(reversing the
presumption against forum selection clauses).  A forum selection
clause is viewed as mandatory when "it clearly limits actions to
the courts of a specific locale" and permissive when it
demonstrates consent to a particular forum without stating
exclusivity.  BP Marine Americas, a Div. of BP Exploration & Oil
Corp. v. Geostar Shipping Co. N.V., Civ. A. No. 94-2118, 1995 WL
131056, *4 (E.D. La. Mar. 22, 1995)(unpublished)(citing M/S BREMEN,
407 U.S. at *2; Caldas & Sons, Inc. v. Willingham, 17 F.3d 123 (5th
Cir. 1994)).

     The United States Supreme Court ("Court") confirmed that forum
selection clauses should be enforced under admiralty law unless
enforcement is unreasonable or unjust under the circumstances.  M/S
BREMEN, 407 U.S. at 10, 15.  There, the court answered the question
whether the district court "should have exercised its jurisdiction
to do more than give effect to the legitimate expectations of the
parties, manifested in their freely negotiated agreement, by

specifically enforcing the forum clause." Id. at 12.  The case concerned a clause stating that "[a]ny dispute arising must be treated before the London Court of Justice." Id. at 3.  The Court pointed out that including a forum selection clause eliminates uncertainties and inconveniences and that the parties likely factor the inclusion of such a clause into their negotiations. Id. at 13-14. A contractual forum selection clause should control, the Court concluded, "absent a strong showing that it should be set aside." Id. at 15.

Despite its clarity on the treatment of forum selection clauses, the M/S BREMEN case did not involve attachment pursuant to Supplemental Rule B.  See id. at 2.  The Ninth Circuit faced that issue a decade later.  Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627, 631 (9th Cir. 1982).  The precise question was: "[w]hether, in an admiralty and maritime action where there is an enforceable foreign court selection clause, the district court, instead of unconditionally dismissing the action, may ensure the availability of security pending a determination of the merits in the contractually selected forum." Id. at 631.  Relying on M/S BREMEN, the Ninth Circuit acknowledged that a valid forum selection clause generally warrants dismissal of the action. Polar Shipping Ltd., 680 F.2d at 631.  However, the court concluded that dismissal was not required in every action and that Supplemental Rule B may be used in certain cases to ensure the availability of security in

13

case of a favorable judgment.  <u>Id.</u> at 632.

The key to a court's decision whether to exercise jurisdiction over a Supplemental Rule B attachment is the language of the particular forum selection clause.  <u>Id.</u> at 632.  The clause at issue in the <u>Polar Shipping Ltd.</u> case stated that "(a)ny dispute arising under the charter shall be decided by the English Courts." <u>Id.</u>  The Ninth Circuit found that the wording did not encompass security proceedings because they did not fit precisely within the word "dispute."  <u>Id.</u>

Upon that foundation, the court provided the following, oft-quoted guidelines:

> We hold that in an admiralty action, absent express intent to the contrary, a forum selection clause providing that all disputes under the charter will be determined by a selected foreign court neither precludes a plaintiff from commencing an action in the district court to obtain security by maritime attachment, nor prohibits the district court from ensuring the availability of security adequate to satisfy a favorable judgment by the selected forum.

<u>Id.</u> at 633.  The court further suggested that a court limit its jurisdiction to that which is necessary to provide adequate security and use its discretion in deciding whether a plaintiff would be prejudiced by vacating the attachment.  <u>Id.</u>

Turning the language of the forum selection clause in this case, the court notes that, unlike the contracts considered in <u>M/S BREMEN</u> and <u>Polar Shipping Ltd.</u>, nowhere in the forum selection clauses of the Bunker Swap Contracts is the word "dispute."

Instead, the forum selection clauses refer to "the exclusive jurisdiction" of courts in the State of New York. The court, therefore, finds that the specific holding of Polar Shipping Ltd. is inapposite. On the other hand, the reasoning of that case, which focused on giving effect to the intentions of the contracting parties, is relevant. However, it leads to a contrary result. Here, the parties did not limit their selection of a forum solely to "disputes" but, rather, created an all-encompassing provision by choosing an "exclusive jurisdiction." See Polar Shipping Ltd., 680 F.2d at 632 (observing that the parties could have worded the clause to convey the intention for all proceedings to be before the chosen forum).

The cases cited by the parties applying M/S BREMEN and Polar Shipping Ltd. are consistent with this court's interpretation. The language of the contract at issue drives each court's decision. For example, in the case Teyseer Cement Co. v. Halla Mar. Corp., 583 F. Supp. 1268, 1271 (W.D. Wash. 1984), the court confirmed on reconsideration its decision to dismiss the attachment and posted security based on its interpretation of the forum selection clause. The court particularly noted that the provision stated that all disputes were to be decided in Korea "*to the exclusion of the jurisdiction of the courts of any other country*." Id.

The United States District Court for the Southern District of Florida agreed with the Western District of Washington that the

15

forum selection clause in the Washington case "evinc[ed] the kind of express intent" required by <u>Polar Shipping Ltd.</u>  <u>Liverpool & London S.S Prot. & Indem. Ass'n, Ltd. v. Islas Galapagos Turismo & Vapores</u>, No. 97-1837-CIV-MARCUS, 1997 WL 900841, at *3 (S.D. Fla. Oct. 15, 1997).   In contrast, the Southern District of Florida found that the contract before it incorporated rules dictating only where the merits were to be adjudicated.  <u>Id.</u>  Finding that language more restrictive than that in <u>Polar Shipping Ltd.</u>, the court refused to vacate attachment.  <u>Id.</u> at *3, *5.

Finally, the facts of the case that Heidmar submits the court should follow, <u>Consub Del. LLC v. Schahin Engenharia Limitada</u>, 543 F.3d 104 (2$^{d}$ Cir. 2008), <u>abrogated on other grounds by</u> <u>Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.</u>, 585 F.3d 58 (2$^{d}$ Cir. 2009), do not coincide with those sub judice.  In that case, the parties entered into a novation agreement by which Consub Delaware LLC ("Consub") assumed the obligations of a party to a prior agreement and thereby became bound by the terms of the original contract.  <u>Id.</u> at 106.  The original agreement contained a clause that stated it was to be considered executed in England and "subject to English law under the exclusive jurisdiction of the courts of England and Wales."  <u>Id.</u>  The novation agreement, on the other hand, contained a clause reading, "[e]ach of the parties hereby submit [sic] to the exclusive jurisdiction of the English Courts in relation to any dispute or claim arising out of or in

connection with this Novation Agreement." Id. (alterations in the original).  Both agreements provided for arbitration as an alternative to litigation, and the original agreement explicitly allowed any court with jurisdiction to enter judgment upon an arbitration award and for the enforcement of an arbitration decision against the parties or their assets "wherever they may be found."  Id.

Reading these provisions as a whole, the court determined that the parties' intent was not to preclude Supplemental Rule B attachments.  Id. at 113.  The court's reasoning is consistent with Polar Shipping Ltd. in that it focused on several relevant contract provisions and, leaving none without meaning, reached a rational interpretation of the parties' intent.  See id. at 113-14. Although one provision was a seemingly all-encompassing selection of the courts of England and Wales, other provisions of the same contract allowed for arbitration and the involvement of other courts for enforcement of an arbitration award.  See id. at 106. Additionally, a provision of the novation agreement, which was the only contract directly executed by the parties in suit, selected English Courts for the resolution of "any dispute or claim," a narrower forum selection clause as in Polar Shipping Ltd.  See id.

As explained above, the court finds that the forum selection clause at issue here is mandatory and requires dismissal of this

17

case in favor of the courts of the State of New York.[31]   The Supplemental Rule B attachment should be vacated.

As the court finds that Plaintiff's attachment of the M/T EMIRATES STAR should be vacated because the underlying contracts require that suit be brought only in the State of New York, the court does not reach Plaintiff's alter ego allegations.

**IV.   Conclusion**

Claimant's Amended Motion to Vacate is therefore **GRANTED**.

**SIGNED** in Houston, Texas, this 18th  day of November, 2011.

Nancy K. Johnson
United States Magistrate Judge

---

[31]    The court notes that Heidmar has filed a nearly identical case against ETA in the Southern District of New York.  See Heidmar Trading LLC v. Emirates Trading Agency LLC, No. 1:11-cv-004489-MGC (S.D.N.Y.).

18